UNITED STATES BANKRUPTCY COURT

WESTERN DISTRICT OF WISCONSIN

---

In re:                                                         Case Number: 12-13807-7

RAYMOND ROBERT SAXE, JR.,
and YVONNE MARIE SAXE,

Debtors.

---

### MEMORANDUM DECISION ON DEBTORS' MOTION TO AVOID LIENS

Robert and Yvonne Saxe (the "Debtors") moved pursuant to 11 U.S.C. § 522(f) to avoid the lien of the United States Department of Agriculture, Farm Service Agency ("FSA"), in certain tangible farm personal property and equipment. FSA asserts that the lien on one piece of equipment—a skidsteer—is not avoidable because it is a purchase-money security interest. The parties filed briefs and relevant documents supporting their respective positions.

After considering the arguments presented, the motion is DENIED with respect to the skidsteer. This Memorandum Decision constitutes this Court's findings of facts and conclusions of law in accordance with Rule 7052 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules").

### *JURISDICTION*

The federal district courts have "original and exclusive jurisdiction" of all cases under title 11 ("Bankruptcy Code" or "Code") and "original but not exclusive jurisdiction" of all civil proceedings that arise under the Bankruptcy

Code, or that arise in or are related to cases under the Code. 28 U.S.C. §§ 1134(a)-(b) (2012). The district courts may, however, refer such cases to the bankruptcy judges for their district. 28 U.S.C. § 157(a) (2012). In the Western District of Wisconsin, the district court has made such a reference. *See* Western District of Wisconsin Administrative Order 161 (July 12, 1984).

Pursuant to the reference, this Court "may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . and may enter appropriate orders and judgments, subject to review under section 158 of this title." 28 U.S.C. § 157(b)(1) (2012). A motion to avoid a lien arises in a case under title 11, and proceedings to determine the validity, extent, or priority of liens are core proceedings. 28 U.S.C. § 157(b)(2)(K) (2012); *In re Quade*, 482 B.R. 217, 221 (Bankr. N.D. Ill. 2012); *In re Rosol*, 114 B.R. 560, 562 (Bankr. N.D. Ill. 1989).

Accordingly, this Court has both the jurisdiction and the authority to enter final judgment in this matter.

### *FACTS AND PROCEDURAL HISTORY*

Debtors signed a Promissory Note ("2004 Note") dated September 20, 2004, in favor of FSA. To secure the 2004 Note, the Debtors executed a Security Agreement ("2004 Security Agreement"). The 2004 Security Agreement granted a security interest in "farm and other equipment" including "1 skidsteer to be purchased." The security interest was perfected by the filing of a Uniform Commercial Code Financing Statement ("Financing Statement") on

September 9, 2004. On or about September 24, 2004, the Debtors purchased the skidsteer. The Debtors admit the funds used to purchase the skidsteer were borrowed from FSA as part of the funds loaned under the 2004 Note.

On September 27, 2006, the Debtors executed and delivered a new note to FSA ("2006 Note"). An Addendum to the 2006 Note modifying the payment terms appears on the signature page to the 2006 Note. The 2006 Note states it is a "Rescheduling" and that there are "Deferred payments." The 2006 Note changed the payment schedule and extended the term of the FSA loan from seven to ten years. No additional funds were advanced under the 2006 Note. FSA retained the 2004 Note and the 2004 Security Agreement. A UCC Continuation Statement was filed on March 13, 2009.

A security agreement dated January 1, 2010 ("2010 Security Agreement"), was also executed by the Debtors and delivered to FSA granting a security interest in, among other assets, "all farm and other equipment."

On June 29, 2012, the Debtors filed a Chapter 7 petition. The Debtors' Schedule D listed FSA as a creditor holding a claim in the amount $160,000. The Debtors elected to claim the Wisconsin "tools of the trade" exemptions under Wis. Stat. § 815.18(3)(b)(1) and applied this exemption against the skidsteer and other equipment.

The Debtors assert the skidsteer and four other pieces of equipment are encumbered by nonpossessory, nonpurchase-money liens held by FSA. They argue these items could otherwise be exempted under state law and have

moved to avoid FSA's liens pursuant to § 522(f) of the Bankruptcy Code. Of the property sought to be exempted, the only item relevant to the motion is the skidsteer.[1]

FSA objects to the motion with respect to the skidsteer. It asserts it holds a purchase-money security interest ("PMSI") in the item, and that therefore the lien cannot be avoided under § 522(f).

### *SUMMARY OF ARGUMENTS*

The Debtors dispute the purchase-money status of the FSA lien on the skidsteer and argue it is avoidable. Their theories can be summarized as follows: (1) the lien is not purchase-money because there was no separate security agreement or UCC financing statement relating to the skidsteer, and neither the security agreements nor the UCC filings state the interest is purchase-money; (2) even if the lien was originally purchase-money, the 2006 Note effected a novation that destroyed the purchase-money character of the interest; and finally, (3) if the interest is purchase-money, then the payments that were made on the debt should be applied first to the PMSI in the skidsteer, thus satisfying the lien.

FSA argues that the lien is not avoidable by virtue of its PMSI. It argues that the Debtors concede the skidsteer was purchased with funds from the FSA loan. Additionally, FSA points to language contained in the 2004 Security

---

[1] A 1086 Tractor, a 766 Tractor, a WW Stock Trailer, and a New Holland Chopper were originally addressed in the motion. FSA does not claim these items were purchase-money, nor does it dispute that the lien on those items is avoidable.

Agreement that the skidsteer was "to be purchased," the invoice and receipt for the skidsteer, and the supervised bank account documentation as further confirmation of the purchase-money nature of its security interest. The 2006 Note was, according to FSA, simply a rescheduling of payments and did not satisfy the 2004 Note. FSA argues that since it gave a single loan secured by multiple items of collateral, it is not possible to determine how much of any payment was applied to which item.

## *DISCUSSION*

Section 522(f) of the Code allows a debtor to avoid the fixing of a lien to the extent the lien impairs an exemption to which the debtor would be entitled under 11 U.S.C. § 522(b), provided the lien is a nonpossessory, nonpurchase-money security interest in tools of the trade. The Debtors' motion therefore presents three questions: first, whether the security interest was a purchase-money interest when first granted; second, whether the execution and delivery of the 2006 Note constituted a novation that destroyed the purchase-money character of the security interest; and finally, assuming the PMSI continued, whether the payments made by the Debtors must be applied first against the price of the skidsteer, thus satisfying any purchase-money security interest.

### Creation of a PMSI in the Skidsteer

"Purchase-money security interest" is not defined in the Bankruptcy Code. However, the Uniform Commercial Code provides guidance as to the

meaning of the phrase. Section 409.103, Wis. Stat., contains the following definitions:

> (1)(a) "Purchase-money collateral" means goods or software that secures a purchase-money obligation incurred with respect to that collateral.
>
> (b) "Purchase-money obligation" means an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used.
>
> (2) A security interest in goods is a purchase-money security interest:
>
> (a) To the extent that the goods are purchase-money collateral with respect to that security interest;

The Debtors acknowledge that a portion of the money disbursed in connection with the 2004 Note was used to purchase the skidsteer, and the 2004 Security Agreement confirms the skidsteer was "to be purchased." The 2004 Note is a purchase-money obligation within the meaning of Wis. Stat. § 409.103(1)(b) because the loan included the entire price of the skidsteer and loan funds were used "to enable the debtor to acquire rights in" the skidsteer. Likewise, the skidsteer is purchase-money collateral under Wis. Stat. § 409.103(1)(a) because it secured a purchase-money obligation. Therefore, the security interest granted to FSA in 2004 was a PMSI.

The argument that the absence of a "specific or unique security agreement" or UCC filing regarding the skidsteer prevented the creation of a PMSI is unpersuasive. The purchase-money nature of the security interest

described in a security agreement need not be explicitly stated, nor must the UCC financing statement filed to perfect the interest explicitly state that it is a PMSI. The UCC governs the creation and the perfection of security interests. Wis. Stat. § 409.101, et seq. Perfection occurs through the process of filing financing statements. Wis. Stat. § 409.301, et seq. The UCC also specifies the contents of a financing statement, and controls how security interests in different types of collateral are created and perfected. It contains no requirements that the purchase-money character of a security interest be specifically described in the security agreement or the financing statement. Wis. Stat. § 409.324 governing the priority of purchase-money security interests merely states that "a perfected PMSI . . . has priority . . . when the debtor receives possession of the collateral or within twenty days thereafter."

The Debtors' claim that there is no PMSI because FSA did not create a separate security agreement or file a separate financing statement evidencing only the purchase-money goods is unconvincing. The UCC is clear that obligations can be secured simultaneously by purchase-money and nonpurchase-money collateral without disturbing the purchase-money character of the security interest. *See* UCC § 9-103(f). Indeed, the Official Comments are explicit on this point:

> **a. "Dual-Status" Rule.** For transactions other than consumer-goods transactions, this Article approves what some cases have called the "dual-status" rule, under which a security interest may be a purchase-money security interest to some extent and a non-purchase-money security interest to some extent. . . . For non-

> consumer-goods transactions, this Article rejects the "transformation" rule adopted by some cases, under which any cross-collateralization, refinancing, or the like destroys the purchase-money status entirely.

UCC § 9-103 Official Comment ¶ 7a . To the extent the Debtors' argument is to the contrary, it fails.

Continued Existence of the PMSI

The Debtors also contend the execution of the 2006 Note constituted a novation that resulted in the cancellation of the purchase-money status of the FSA lien. They rely on *In re Weinbrenner*, 53 B.R. 571 (Bankr. W.D. Wis. 1985), for the proposition that refinancing destroys a PMSI by effecting a novation. FSA argues that the purchase-money lien survived the execution of the 2006 Note.

The Debtors point to *Weinbrenner* to support the argument that a refinancing destroys the purchase-money character of the interest. They acknowledge there is a split of authority on the effect of refinancing but argue, incorrectly, that there is no distinction between a rescheduling and a novation.

The *Weinbrenner* decision outlines the transformation rule used by some courts to hold that a purchase-money security interest is automatically transformed into a nonpurchase-money interest when the proceeds of a renewal note are used to satisfy the original note. *Weinbrenner* at 579. There is another line of cases that follows the "dual-status" rule, which holds that a lien may be partially purchase-money and partially nonpurchase-money and

that the purchase-money aspect of a lien is not automatically destroyed by refinancing or consolidation with another debt. *In re Short*, 170 B.R. 128, 133 (Bankr. S.D. Ill. 1994). Neither line of cases is controlling. Courts in the Seventh Circuit have taken a case-by-case approach that examines whether the debtor's obligation has been so changed by refinancing that the lien should no longer be characterized as purchase-money. *Id.* at 134.

In determining whether a refinancing is simply a renewal of the original purchase-money obligation or is a novation, the degree of difference between the two loans must be considered. *Id.* The four elements of a novation, which the party asserting novation must prove by a preponderance of the evidence, are: 1) a valid existing obligation; 2) a subsequent agreement of all of the parties to the new contract; 3) the extinguishment of the old contract; and 4) a valid new contract. *Navine v. Peltier*, 48 Wis. 2d 588, 593, 180 N.W.2d 613, 615 (Wis. 1970). All of the requisite elements of a novation must be present. If any one of the elements is missing, then no novation occurred.

There is no evidence in the record of an agreement by all of the parties that the 2004 Note was to be extinguished. To the contrary, the 2006 Note references payment rescheduling. Moreover, the 2004 Note was not returned to the Debtors. Under state law there is no novation unless the original indebtedness is extinguished and canceled. *Id.* at 594; *Siva Truck Leasing, Inc. v. Kurman Distributors*, 166 Wis. 2d 58, 67, 479 N.W.2d 542, 546 (Wis. Ct. App. 1991).

The differences between the 2004 Note and the 2006 Note are minimal. The same creditor made both the original and the refinanced loan. Both were secured by the same property/collateral. There was a single loan in 2004. No additional funds were lent in 2006. The 2004 Security Agreement and the related UCC Financing Statement were not released. The principal amount of the 2006 Note reflected the reduced principal balance owed on the 2004 Note. The term of the loan was simply extended from seven to ten years and the annual payment amounts were reduced accordingly. No new parties were added to the 2006 Note.

The *Weinbrenner* court also addressed the issue of the effect of a novation on a PMSI. *Weinbrenner*, 53 B.R. at 580. The court concluded that refinancing effects a novation only if the substance of the refinancing showed that the parties intended to substitute obligations or parties and was supported by consideration. *Id.* at 581. In *Weinbrenner*, the parties had consolidated five promissory notes under a single "basic loan agreement." *Id.* at 575. The earlier notes were all stamped "[t]his note has been replaced by a basic loan agreement," and the basic loan agreement specifically stated that it "amends and replaces any earlier loan agreements outstanding between the parties." *Id.* at 575-76. The court found that this was sufficient evidence that the parties clearly intended to replace their earlier obligations with new ones.

FSA did not mark the 2004 Note "paid" or "replaced." It did not deliver the original of that note to the Debtors. *See Davlin v. Kowalk*, 54 Ohio App.

222, 231-33, 6 N.E.2d 798, 802 (Ohio Ct. App. 1935). Further, there is no evidence that FSA consented or agreed to extinguishment of the 2004 Note and 2004 Security Agreement.

When, as here, the original debt is merely extended and not discharged, the secured creditor does not lose the security interest. *See In re Cantrill Constr. Co.,* 418 F.2d 705, 706-07 (6th Cir. 1969). Further, the "refinancing" of the purchase-money obligation does not transform the purchase-money security interest into a nonpurchase-money security agreement. *See Hill v. Norwest Fin. Kan., Inc. (In re Hill),* 226 B.R. 284, 284-85 (B.A.P. 10th Cir. 1998).

Moreover, the Debtors overlook the amendments to Wisconsin state statutes that occurred in 2001. Wis. Stat. § 409.103(6) states:

> **(6) No loss of status of purchase-money security interest in nonconsumer-goods transaction.** In a transaction other than a consumer-goods transaction, a purchase-money security interest does not lose its status as such, even if:
>
> (a) The purchase-money collateral also secures an obligation that is not a purchase-money obligation;
>
> (b) Collateral that is not purchase-money collateral also secures the purchase-money obligation; or
>
> (c) The purchase-money obligation has been renewed, refinanced, consolidated, or restructured.

Adopted after *Weinbrenner,* the statute prohibits the very conclusion the Debtors argue this Court should reach. Accordingly, the purchase-money interest of FSA was not destroyed or terminated when the 2006 Note and

Security Agreement were executed. The interest remained a purchase-money security interest.

## Allocation of Payments

Having concluded that FSA held a PMSI in the skidsteer that was not terminated by the rescheduling of the Debtors' loan obligation, the final issue to be addressed is whether that security interest should nevertheless be satisfied by the application of payments. The Debtors argue that all payments made must be applied to the portion of the loan attributable to the skidsteer.

In *Weinbrenner*, the court was confronted with the "impossibility of apportioning the payments which have been made among the various purchase prices of the collateral." *Weinbrenner*, 53 B.R. at 579. In that case there was a series of five promissory notes. The notes were replaced by a "basic loan agreement" and a security agreement that cross-collateralized all indebtedness. The *Weinbrenner* court found that applying the transformation rule would reach the harsh result of depriving a lender of its PMSI simply for consolidating PMSI and non-PMSI obligations. *Id.* To avoid this outcome, the *Weinbrenner* court opted to exercise its equitable powers to fashion a more just remedy. *Id.* at 579-80 (citing *In re Conn*, 16 B.R. 454 (Bankr. W.D. Ky. 1982)); *see also Moser Paper Co. v. North Shore Publishing Co.*, 83 Wis. 2d 852, 858, 266 N.W.2d 411, 415 (Wis. 1978) ("If neither the creditor nor the debtor applies the payment, then the court makes the application in accordance with equitable principles.").

On the facts presented, the *Weinbrenner* court concluded the amount repaid by the debtors was so substantial that it was not necessary to apply payments to particular items of collateral. *Id.* at 580. The difference between the initial amount owed and the total balance due when the notes were consolidated revealed that the debtors had paid far more than was owed on all of the items in which the lender claimed a PMSI. *Id.* Because the disputed items were the first acquired by the debtors, applying the "first-in, first-out" method meant that the items had been paid off.

The case before this Court is not the typical case in which a series of purchase-money security loans are later consolidated into a single note, or where a new loan is consolidated with a partially paid off pre-existing PMSI loan. Unlike *Weinbrenner*, in the present case there was a single loan, and a single grant of security including the PMSI in the skidsteer. The Debtors used the loan proceeds for various purposes: first to pay off other obligations, then to acquire the skidsteer, and then to pay various other obligations and expenses. The Debtors made payments on the loan, and the question now is whether those payments should be applied first to pay off the value of a single piece of collateral—the skidsteer—and thus satisfy the PMSI, or whether the purchase-money interest should be preserved.

The heart of the analysis is the intention of the parties. The best indication of this intention are the terms and provisions of the notes. If the note specifies an application, the provisions of the note control. The 2004 Note

and 2006 Note state the loan is an "OL loan" made pursuant to a federal loan program and, accordingly, subject to any applicable federal regulations.

The 2004 Note and 2006 Note are otherwise silent with respect to the application of payments in this circumstance.  There is the reference to federal regulations pertaining to these types of loans.  However, those regulations merely provide that "[e]mployees receiving payments on OL . . . loan accounts will select, in accordance with the provisions of this section, the account(s) to which such payment will be applied . . . . All payments on all other loans including OL . . . loans approved after December 31, 1971, will be credited first to any administrative costs, then to noncapitalized interest, then to the amount of accrued deferred interest, then to interest accrued to the date of the payment and then to principal, in accordance with the terms of the note."  7 C.F.R. pt. 1951, subpt. A, § 1951.10.  The regulation therefore specifies in what order payments are to be applied among separate loans or to the various components of the loan.  That is, payments are applied first to costs, then interest, and then to principal.  Beyond this, however, the regulation does not indicate how payments are to be applied to collateral securing the same loan.  It offers no rule for the application of payments in the circumstances presented in this case.  Thus, we next turn to state law to determine if it provides any guidance.

The UCC is the applicable state law source for guidance on application of payments.  The applicable section was revised after the *Weinbrenner* decision,

in part to address the very issue presented in that case. Wis. Stat. § 409.103(5)(c) provides:

> **(5) Application of payment in nonconsumer-goods transaction.** In a transaction other than a consumer-goods transaction, if the extent to which a security interest is a purchase-money security interest depends on the application of a payment to a particular obligation, the payment must be applied:
>
> (a) In accordance with any reasonable method of application to which the parties agree;
>
> (b) In the absence of the parties' agreement to a reasonable method, in accordance with any intention of the obligor manifested at or before the time of payment; or
>
> (c) In the absence of an agreement to a reasonable method and a timely manifestation of the obligor's intention, in the following order:
>
> 1. To obligations that are not secured; and
>
> 2. If more than one obligation is secured, to obligations secured by purchase-money security interests in the order in which those obligations were incurred.

Section 409.103(5)(c) does not differentiate between PMSI and non-PMSI collateral. It establishes an order of payment when there are both secured and unsecured obligations, and an order of payment when there are multiple obligations that are secured by purchase-money security interests. It does not indicate an order of application between PMSI and non-PMSI items that secure the same obligation.

The Debtors are farmers, and the record is clear that the skidsteer is equipment that was purchased for use in farming operations. It was not

Case 1-12-13807-cjf    Doc 31    Filed 03/22/13    Entered 03/22/13 16:23:31    Desc Main
Document    Page 16 of 20

purchased for recreational, household, personal or other consumer use. Neither party disputes that in the context of this case, the skidsteer is a nonconsumer-good. Furthermore, both parties acknowledge that, assuming there was a purchase-money security interest, the application of payments to the obligation secured by the skidsteer and the rest of the collateral will determine whether and to what extent FSA's PMSI is preserved.

Aside from the addendum to the 2006 Note, there is no evidence that the parties ever agreed on a method for the application of payments. And, from the record before the Court, the Debtors do not appear ever to have manifested an intention concerning the application of payments among items of collateral. Thus neither § 409.103(5)(a) nor § 409.103(5)(b) control this situation.

The Court next examines Wis. Stat. § 409.103(5)(c) to determine if it is applicable because it addresses the same issue presented in *Weinbrenner*—namely the application of payments—and used as the basis for the Debtors' argument that the purchase-money interest in the skidsteer should be considered paid.

Principles of statutory interpretation govern the Court's approach to the present problem. To find a statute's meaning, its language is always consulted first. 3A N. Singer & J. Singer, *Sutherland Statutory Construction* § 71:6 (7th ed. 2012) (internal citations omitted); *Armor All Prods. v. Amoco Oil Co.*, 194 Wis. 2d 35, 50, 533 N.W.2d 720, 725 (Wis. 1995). Unless defined elsewhere by custom, statute, or judicial construction, courts look to the plain meaning of

the language. 3A *Sutherland* § 71:6. Where terms are not defined, courts turn to the dictionary to find the terms' ordinary definition. *Id.* Individual provisions are considered in the context of the whole statute and related sections. *Dubis v. GMAC*, 238 Wis. 2d 608, 612, 618 N.W.2d 266, 268 (Wis. Ct. App. 2000). If, after applying these principles, the statute is ambiguous, courts can consult "the scope, history, context, subject matter and object of the statute." *Armor All Prods.*, 194 Wis. 2d at 50, 533 N.W.2d at 725.

Interpreted literally, subparagraph (c) does not apply to the present facts at all. That provision reads:

> "(c) In the absence of an agreement to a reasonable method and a timely manifestation of the obligor's intention, in the following order:
>
> 1. To obligations that are not secured; and
>
> 2. *If more than one obligation is secured*, to obligations secured by purchase-money security interests in the order in which those obligations were incurred."

Wis. Stat. § 409.103(5)(c) (emphasis added). The plain, literal meaning of this provision is that when there is more than one obligation, in the absence of an agreement by the parties or an indication of a debtor's intent, payments should be applied first to loans that are not secured. Once the unsecured obligations are fully paid, any remaining payments should be applied to PMSIs in the order in which they were incurred, *but only if there is more than one such obligation.*

Wis. Stat. § 409.103(5)(c)(2) is divided into two clauses. The first clause, "If more than one obligation is secured," establishes the condition precedent to

the application of the instruction contained in the second clause that payments should be applied "to obligations secured by purchase-money security interests in the order in which those obligations were incurred." If there is only one secured obligation, then the condition precedent is not satisfied, and the second clause of § 409.103(5)(c)(2) has no effect.

Although they are not part of the statute itself, the Official Comments to Wis. Stat. § 409.103(5)(c) are useful interpretive aids. *See, e.g., Schulte v. Fifth Third Bank*, 805 F. Supp. 2d 560, 581 (N.D. Ill. 2011). Paragraph 7 of the Official Comments to Wis. Stat. § 409.103(5)(c) describes a hypothetical scenario in which a borrower takes a $10,000 loan and grants the lender a PMSI. The borrower then refinances the loan, borrows an additional $2,000 secured by the collateral, and eventually makes a $1,000 payment. *See* Wis. Stat. § 409.103(5)(c) Official Comment ¶ 7. Ignoring the question of whether the refinancing alters the purchase-money character of the lender's interest,[2] the issue raised in the Comment is whether, post-payment, the lender has a PMSI to the extent of $10,000 or $9,000. In such a situation, with no agreement between the parties and no earmarking by the borrower, paragraph 7b states that "[a]fter the unsecured debt is paid, payments are to be applied first toward the obligations secured by purchase-money security interests . . . . Once these obligations are paid, there are no purchase-money security

---

[2]*See* Wis. Stat. § 409.103(6).

interests and no additional allocation rules are needed." *Id.*, Official Comment ¶ 7b.

"Courts give effect to all the language of a statute, as a harmonious whole, rendering no portion meaningless or superfluous." 3A Singer & J. Singer, *Sutherland Statutory Construction* § 71.6 (7th ed. 2012) (internal citations omitted). To find, as Debtors urge, that payments on a single loan should be applied to selective pieces of collateral based simply on their character as purchase-money collateral would violate this fundamental principle of statutory construction. The statute provides a rule for application of payments when there is more than one obligation—whether because there are a series of separate obligations or a single obligation that resulted from the consolidation or refinancing of multiple obligations. It does not provide a rule for the application of payments when there is simply one obligation. There is only one obligation at issue in this case. As a result, Wis. Stat. § 409.103(5)(c) does not apply.

Since the statute does not control under the facts in this case, the question is how the payments should be applied. The drafters of the revisions of the Uniform Commercial Code emphasize that "[p]urchase-money financers are treated preferentially under Article 9." 9A Frederick H. Miller & Neil B. Cohen, *Hawkland UCC Series* § 9-103:3 [Rev] (2012). In the context of bankruptcy, PMSI priority also receives comparable deference and protection. See 11 U.S.C. § 522(f)(1)(B). Section 522 generally permits a debtor to avoid the fixing of liens on property in order to preserve an exemption to which a debtor

-19-

is entitled. It specifically excludes, however, purchase-money security interests from the category of liens that may be avoided. The inference is clear: holders of a purchase-money security interest are entitled to the preservation of their interest against the claims of other creditors, even in bankruptcy.

Given the policy that is at the foundation of the purchase-money security interest and the fact there is but a single obligation secured by the skidsteer, the answer to the question of how to apply payments in this situation is relatively straightforward. The payments should be applied to the whole debt, not to any one particular item of collateral. In this situation, the PMSI is removed from the collateral only after the entire debt has been satisfied. The amount of equity at issue does not come close to satisfying the remaining balance of the loan. As a result, the purchase-money security interest that FSA has in the skidsteer remains intact, and the Debtors may not avoid the lien under 11 U.S.C. § 522(f).

## *CONCLUSION*

Based on the foregoing findings of fact and conclusions of law, the Debtors' motion to avoid the lien of FSA is hereby DENIED with respect to the skidsteer.

A separate order consistent with this decision will be entered.

Dated: March 22, 2013

BY THE COURT:

/s/ Catherine J. Furay
_____
Hon. Catherine J. Furay
U.S. Bankruptcy Judge
